## S. B. DICK ET AL. *v.* L. N. IRELAND ET AL.

APPEAL BY DEFENDANTS FROM THE COURT OF COMMON PLEAS OF BUTLER COUNTY, IN EQUITY.

Argued October 22, 1889—Decided November 11, 1889.
[To be reported.]

1. A special manuscript addition to a printed form used in drawing up a contract, is entitled to especial weight in construing the contract, as it is presumed to have been separately and particularly considered by the parties, and to express their exact agreement on the subject of it.

(*a*) In an agreement for the manufacture, under a license, of a patented article, the licensees reserved the right at any time to cancel the contract by giving thirty days' notice in writing to the owner of the patent, and paying all dues for royalties under the license.

Statement of Facts.

(b) The licensees wrote to the owners of the patent: "We wish to cancel our license, . . . . as per contract. You will please return our bond to us, and we will return the license to you by return mail." They paid royalties for the thirty days succeeding the date of their letter, but thereafter ceased to manufacture under the patent.

2. This letter was not merely the expression of a wish to cancel and a willingness to return the license on receipt of the bond, but was an absolute and complete rescission of the contract, the courteous phrases used importing nothing in the nature of a request for the consent of the other party.

3. An agreement that, upon exercising an option to cancel a license for the manufacture of patented drilling jars, the licensee shall "stop making the jars thereafter," plainly refers to the jars covered by the licensor's patent, and does not require the licensee to refrain from making other jars.

4. Upon the uncorroborated testimony of a single interested witness, opposed to the sworn answer of the defendants, equity will not reform a written agreement in a material particular, especially when such testimony is lacking in precision of language, and the story of the witness is inherently improbable.

5. When a contract requires that one of the parties shall keep books which he shall submit, when called upon, to the inspection of the other party, the former may be justified in refusing to comply with a demand for such inspection, if coupled with another demand unwarranted by the contract.

Before STERRETT, GREEN, CLARK, McCOLLUM and MITCHELL, JJ.

No. 182 October Term 1889, Sup. Ct.; court below, No. 5 June Term 1885, C. P. in Equity.

On May 6, 1885, Samuel B. Dick, and F. W. Ames, receiver of the Gibbs & Sterrett Manufacturing Company, filed a bill in equity against L. N. Ireland and S. McCaughtry, doing business as L. N. Ireland & Co. The bill averred:

That Edward Guillod, the inventor of a certain improvement in the construction of drilling jars, made application under the laws of the United States for a patent for his said invention, and letters patent covering the same were duly issued to Bryan, Dillingham & Co., as his assignees, for the term of seventeen years from June 16, 1868; that on June 22, 1869, said letters patent were surrendered and a re-issue made for the residue of the term; that by various assignments said re-issued letters patent became vested in the Gibbs & Sterrett Manufacturing Co. et al., who on

May 16, 1876, granted to the defendants a license to manufacture jars under said patent by the contract following:

"Memorandum of agreement made May 16, A. D. 1876, between D. H. Mitchell and the Gibbs & Sterrett Manufacturing Co., of the city of Titusville, Crawford county, Pa. of the first part, and L. N. Ireland & Co., of the second part.

"Whereas, the parties of the first part are the owners of letters patent granted to Bryan, Dillingham & Co., 78,958, dated June 16, 1868, and re-issued to John C. Bryan, June 22, 1869, and No. 3,510 for certain improvements in the construction of drilling jars or jar fillings, and said second parties desire to manufacture said jars for sale and use. Now, therefore, the parties of the first part, hereby agree to and do license the said second parties to manufacture and sell said jars and jar fillings at their place of business in Petrolia, Butler county, Pa., as long as they perform the stipulations and agreements herein specified to be performed by said second parties. In consideration whereof, the said parties of the second part agree to render to said first parties, their heirs or assigns, on or before the fifth day of each and every month, a full, true and perfect statement of all jars and jar fillings made during the preceding month, and to whom sold; which statement shall be verified by the affidavit of the parties of the second part, or their agent; and said parties of the second part agree to pay to said first parties, their heirs or assigns, at the time said statement is rendered, the sum of ten dollars, as royalty for each and every jar or jar filling so made during the preceding month. . . . .

"Said second parties shall keep a book containing a list of all jars or jar fillings made and to whom sold and the dates of said sales, which book shall at all reasonable times be open to inspection of the parties of the first part and their agents. Said second parties further agree and bind themselves not to make or sell any other jars or jar fillings than those covered by said letters patent during the continuance of this agreement. . . . ."

Upon the margin of the printed form containing the foregoing agreement, executed under seal by the parties, and attested by R. H. Sterrett, was written the following memorandum:

"It is agreed by parties of first part that the parties of second part can cancel this license by giving thirty days notice in writing and paying all dues.        R. H. STERRETT."

The bill further averred the non-payment of royalties due under said license, and various breaches thereof by the defendants, and prayed for an account, etc., and for general relief.

The defendants answered, denying the validity of the patent, and the plaintiffs' title thereto ; averring that on December 19, 1878, in accordance with its terms, the defendants elected to cancel said contract, and did so by giving to the plaintiffs a written notice of that date, directed to R. H. Sterrett, Esq., at Titusville, in the words following :

" Sir : We wish to cancel our license concerning the manufacture of drilling jars, bearing date of May 16, 1876, as per contract. You will please return our bond to us, and we will return the license by mail. Yours truly,"

The answer further averred that the defendants had paid all royalties during the time the license was in force ; and denied the liability of the defendants to account to the plaintiffs.

Issue having been joined, the cause was referred to *Mr. R. P. Scott*, as examiner and master.

On August 28, 1886, while the case was in progress before the master, the plaintiffs, by leave of the court, amended their bill by averring that the words " and stop making the jars thereafter " were a part of the contract as agreed to at the time of the execution of the license set out in the bill, but were omitted by the inadvertence and mistake of the scrivener from the agreement written upon the margin of the printed license granted to the defendants on May 16, 1876, and should have been inserted at the end thereof. The defendants thereupon answered, denying this averment.

In support of the averment introduced by their amendment, the plaintiffs called R. H. Sterrett, a stockholder in the Gibbs & Sterrett Manufacturing Company, and the agent of the plaintiffs, who testified before the master as follows : " At the time the license was given, Mr. Ireland said to me, supposing we, at any time, want to quit business, how can we surrender our license and get our bond back. I told him that at any time they wanted to quit business, or did quit business (we were talking about the manufacture of jars, the jar business), that he could do so by giving thirty days' notice, paying all dues according to the terms of the contract, and I told him I would endorse that on the margin of the contract, and I did. The

arrangement was that he could get the bond back any time he quit manufacturing jars. Inadvertently I indorsed only a part of that contract on the margin. I left out that part about quitting the manufacture of jars. It was also a part of the agreement that I would return the bond. The arrangement was that any time they wanted to quit the business, or did quit the business, and pay all dues, according to the terms of the license, that I was to return the bond and cancel the license. It was my mistake that this was not in the writing."

The defendants, L. N. Ireland and S. McCaughtry, testified, under objection to their competency upon the ground of the death of D. H. Mitchell, one of the parties to the contract of license, that no agreement was made, in connection with said license, that upon its cancellation by the defendants they should stop the manufacture of jars, but that the writing covered the whole contract, and nothing was omitted therefrom. D. K. Artman, a witness called by the defendants, testified as follows:

A. I was present at the time the contract in suit was made at Petrolia. . . . .

Q. Did you hear any conversation or agreement between the parties, as to the clause written on the margin, except the words written? A. No, sir.

Q. Was there any agreement in your presence or hearing, that when he canceled this agreement, they were to stop making jars altogether? A. No, sir. . . . . I was in the shop all day, not just close all the time the conversation was going on between them; shop is probably 40 or 50 by 60 or 70 feet. We had an office room separate or partitioned off the shop; it was probably 12 by 15 feet. Part of the conversation between Sterrett and Ireland which I have detailed, was in office; other part in main building. I was not in office all the time, was back and forth in shop. Do not say that I heard all the conversation that took place between R. H. Sterrett and defendants that day; think I heard half of it; it was ten years ago, 1876; was not personally interested so as to charge my mind with conversation.

R. H. Sterrett testified further for the plaintiffs: "After I answered letter of Ireland and Hughes, dated December 19, 1878, a short time thereafter I received their final report, either February 8, 1879, or it was dated February 8, 1879. I went

to Petrolia, saw Ireland & Co., told them that I had come to settle their jar account, as per terms of the license, and that I wanted to examine their books, and if I found that they had reported and paid for all the jars made and sold, as per terms of the license, that I was prepared, if they were going to quit making jars, to surrender their bond and cancel their license. Mr. Ireland refused to allow me to examine their books, and told me we had all the reports, information and pay we would ever get on that score. I told him, then, I should not return his bond or cancel the license, but that we should hold him to the terms of his contract or license. Mr. Ireland claimed by the memorandum on the license, that I had agreed to cancel. I told him our agreement was to cancel upon his complying with the terms of the contract, which he had not done, and until he did I should not cancel. I called his attention to that clause in the license requiring them to make sworn statements and to exhibit their books of all jars made and sold, which they had failed and refused to do, and, from my belief, I was not satisfied that they had reported for all jars they had made and sold, but if he would satisfy me by their books that they had done so, and were going to quit making jars, that I would surrender his bond and cancel; but he refused to make any further statements or sworn statements, or allow me to examine the books. I again refused to surrender his bond, and came away and left the matter. I had the license and bond with me at the time."

L. N. Ireland testified denying that he had refused to permit Sterrett to examine the books of the defendants.

On May 27, 1887, the master reported inter alia, as follows:

The evidence of the plaintiffs proves conclusively that the letters patent specified in said contract were duly granted as set forth in paragraph 4 of the plaintiffs' bill; that the plaintiffs were the owners of said letters patent and had the lawful right to license the use thereof, and make the contract with the defendants, giving them the right to make and sell drilling jars and jar fillings, covered and protected by said patent; also, that the defendants continued to manufacture and sell drilling jars and jar fillings at their shop or works at Petrolia, from the date of said license, May 16, 1876, until and after the

expiration of said patent in June, 1885, and did not make monthly statements or pay royalty as provided for in said contract after December, 1878. The defendants admit these facts, but allege that the jars and jar fillings made and sold by them, from December, 1878, to June, 1885, were not made under said license, and that they were not bound to make monthly statements or pay royalty; that on December 19, 1878, they elected to cancel, annul and terminate said contract by giving the plaintiffs notice in writing, according to the terms of said agreement, and that they did, in the manner provided for in said license, cancel and terminate the same and pay all dues, and that said license ceased, terminated and was canceled about January 19, 1879, or thirty days after said notice.

The plaintiffs admit that the notice given by defendants was received by R. H. Sterrett, Esq., but deny that said license ceased, terminated or was canceled, as alleged by the defendants; and contend that it could not be terminated or canceled without their assent, and then only upon the defendants surrendering said license, paying all royalties due to the date of the surrender of said license, receiving back their bonds and ceasing the further manufacture and sale of drilling jars and jar fillings; the plaintiffs alleging by an amendment filed August 28, 1886, that it was a part of the contract or agreement that the defendants were to cease the manufacture of drilling jars and jar fillings, in the event that they should conclude to cancel said license, and that the words, "And stop making the jars thereafter," should have been added to memorandum of agreement, indorsed on the margin of the contract or license, dated May 16, 1876, but that that portion of said contract was omitted from the written memorandum by the inadvertence of Mr. Sterrett, who wrote the contract. Mr. Sterrett conducted all the business with the defendants with reference to said license. . . . . .

The defendants deny that there was any agreement on their part to cease manufacturing jars or jar fillings in case they determined to cancel said license, and deny that the words,. "and stop making jars thereafter," were omitted from said contract by either accident, mistake or inadvertence, and say that the agreement of license given to them covers and contains the whole contract.

Parol evidence is, as a general rule, inadmissible to contra-

dict, change or explain a written contract, except in case of fraud, mistake or accident, and here the plaintiffs allege inadvertence and mistake. The parol evidence offered was not admitted to contradict, change or alter the written contract, but to explain what occurred at the time of the execution of said contract, with reference to the subject matter thereof.

D. H. Mitchell, one of the parties to and assignor of the thing or contract in action, being dead before the filing of this bill, the defendants Ireland and McCaughtry, are incompetent, under the act of 1869, to testify as to what occurred at the time of the execution of said contract, and their testimony (taken under objection) with reference thereto being excluded, and giving all the weight to the testimony of Mr. Artman that it is entitled to, the evidence of Mr. Sterrett, taken in connection with the acts of the defendants with reference to said contract, after the making thereof, sustains the position of the plaintiffs.

Was the letter of the defendants to R. H. Sterrett, dated December 19, 1878, a cancellation of said contract? The letter does not declare a rescission or cancellation of said license by the defendants. It merely expresses a wish to cancel and a willingness on part of the defendants to return the license to plaintiffs upon receipt of their bond. It does not appear anywhere in the written contract of license that the defendants were to or did give a bond to the plaintiffs. But the defendants' letter shows that a bond was given and shows to some extent that there was a part of said contract not expressed in the written agreement of license. The marginal writing on contract provides " That the parties of second part can cancel this license by giving thirty days notice in writing and paying all dues." The defendants' letter requests the return of their bond as a condition precedent to the return or cancellation of the license. These facts taken in connection with the fact that the defendants on May 16, 1876, executed and delivered to the plaintiffs a bond in the sum of five hundred dollars, reciting the contract with the plaintiffs for the manufacture and sale of drilling jars and jar fillings and conditioned for the true performance of said agreement and the making of monthly statements and payments as therein provided, and the testimony of R. H. Sterrett, as to his interview with Ireland in Febru-

ary, 1888, indicate very forcibly and conclusively that said defendants could not terminate said contract at their pleasure, and without the consent of the plaintiffs, but that said license or agreement could only be canceled, terminated and surren- dered with the consent of the plaintiffs, and by the mutual act of both parties.

There is no evidence that the bond of the defendants was ever surrendered to them by the plaintiffs, or that the plaintiffs agreed or consented to the cancellation or surrender of said. agreement of license, but, on the other hand, the plaintiffs on May 6, 1885, entered a judgment against the defendants on their bond at No. 269 June Term 1885.

All the evidence and facts in the case, with reference to the alleged rescission and cancellation of said agreement of license, show such an utter want of mutuality between the plaintiffs and defendants with regard thereto, as to repel the allegation of the defendants that said license was rescinded, terminated and annulled by them January 19, 1879, or that they could cancel the same without the consent of the plaintiffs.

In view of all the evidence in the case, I find the facts as follows :

1. That the letters patent described in the plaintiffs' bill were duly granted as specified in paragraph four of said bill.

2. That the plaintiffs were, at the time of the making of the contract with the defendants, to wit, May 16, 1876, the lawful owners of said patent, and as such had the right to license its use, and make the contract with the defendants, giving them the right to manufacture and vend drilling jars and jar fillings covered and protected by said letters patent.

3. That the defendants, after the date of said contract, May 16, 1876, commenced making drilling jars and jar fillings thereunder.

4. That the defendants agreed not to make or sell any other jar or jar fillings than those covered by said letters patent, during the continuance of said agreement.

5. That the defendants, or one of them, L. N. Ireland, continued to manufacture and sell drilling jars at his shop in Petrolia, Butler county, Pennsylvania, from May 16, 1876, until the expiration of said patent in June, 1885.

6. That the defendants agreed to render to the plaintiffs on

or before the fifth day of each and every month, a full, true and perfect statement of all jars and jar fillings made during the preceding month, and to whom sold. . . . . and to pay the plaintiffs at the time said statement is rendered, the sum of ten dollars, as royalty for each and every jar or jar filling so made during the preceding month.

7. That the defendants have not made or rendered to the plaintiffs any statement of jars or jar fillings made or sold since December, 1878.

8. That the defendants have not paid the plaintiffs the sum of ten dollars on any jars or jar fillings made since December, 1878.

9. [That the letter or notice of the defendants to R. H. Sterrett, dated December 19, 1878, was not a rescission or cancellation of said license, and did not operate as such at any time thereafter.] [1]

10. That the check of the defendants No. 37, dated Petrolia. February 8, 1879, on Argyle Savings Bank, to the order of R. H. Sterrett, for twenty dollars, paid under protest as royalty on letters patent, was for royalty on two sets of jars sold December 24, 1878, to William Reader and Henry Webster, as per report for December, 1878.

[The duration of agreement or contract of license, between the plaintiffs and defendants, was coincident with that of the patent, unless the term thereof was sooner terminated by the mutual act and consent of the plaintiffs and defendants, and there being no termination or cancellation of said contract during the term for which said patent existed, and the defendants having continued the manufacture of drilling jars and jar fillings, from May 16, 1876, until the expiration of said patent, in June, 1885, the liability of the defendants to account to the plaintiffs under said contract would not terminate until after the expiration of the patent.] [2]

Patent rights are property; the owners thereof cannot be deprived thereof without due process of law: Walker on Patents, § 151. The grant of letters patent creates a legal estate of a peculiar character, consisting of the exclusive right to make, vend or use the subject of the grant, for a specific period: Curtis on Patents, § 167; and a licensee who has obtained a license upon certain terms, will be held by a court of equity to

a compliance with those terms. In such cases, however, the court will act with due regard to the subtantial rights of both parties, neither permitting, on the one hand, the licensee to continue his use in disregard of the agreement; nor, on the other hand, working an unreasonable forfeiture of the license: Curtis on Patents, § 438. A party who has had the use of an invention, under a contract for an annual rent, or other estimated rate of payment, may discontinue the payment, and if he still use the invention, the patentee may sue him for the rent due, or for infringement: Curtis on Patents, § 438; Walker on Patents, § 307, note 8; Curtis on Patents, § 307 and note 5.

The defendants took a license to use the plaintiff's property. They were not obliged to make any drilling jars or jar fillings under said license, but, having commenced to make them and continued to make them during and until the expiration of said patent in June, 1885, and having fully enjoyed the advantages contracted for in said license, the defendants became and are liable to account and pay to the plaintiffs the sum of ten dollars for each and every drilling jar and jar filling made by them during the continuance of said license. On the authority of Patterson's App., 11 W. N. 572, I am of opinion that this is a proper case for equitable relief.

—The master thereupon recommended a decree for an account, and that the defendants pay to the plaintiffs the sum of ten dollars for each and every drilling jar or jar filling made by the defendants between December 25, 1878, and June 16, 1885, and also pay the costs.

Exceptions filed to the master's report by the defendants and overruled by him, were renewed before the court, and after argument, the court, HAZEN, P. J., without opinion filed, entered the following decree:

"And now to wit; February 20, 1888, this case came on to be heard on the bill, answer, testimony, master's report and exceptions thereto, and thereupon it is ordered, adjudged and decreed, that the defendants do account to plaintiffs for all drilling jars and jar fillings made by them, or either of them, or under their or either of their directions or employment, from December 25, 1878, to June 16, 1885, at Petrolia, in Butler county, Pa., and pay to plaintiffs the sum of ten dollars for

each and every drilling jar or jar filling made within said time, and also pay the costs of this proceeding; and the same is referred back to R. P. Scott, Esq., the master, for further proceedings in this case before him." [4]

The master thereupon proceeded to state an account in pursuance of the decree. The defendants filed with him a statement, under oath, showing the manufacture and sale by them, within the period specified in the decree, of 724 sets of jars and jar fillings, but averring that only three of them, which were sold during the years 1883 and 1884, were of the character described in the letters patent of the plaintiffs, and that none of the jars and jar fillings embraced in the account were manufactured prior to December 25, 1878, the date when the contract between the plaintiffs and defendants was rescinded.

The plaintiffs having excepted to the statement and affidavit filed by the defendants, the latter, at the final hearing before the master, offered to prove by L. N. Ireland the following facts:

1. That defendants have made but two sets of steel-lined jars of the character described and claimed in plaintiffs' patent, since the date of their alleged rescission of the license in suit, and both of said sets were returned to defendants on account of breakage, and other jars supplied by the defendants in lieu thereof.

2. That all other jars made by defendants were all-steel jars and steel quarter jars, the former having no iron in their construction except the pin, and the latter having no iron in the reins or link-bars, for a distance of nearly one half their length from the knocking head, and no iron surrounding the knocking head.

3. That since the date of the contract in suit and for some time prior thereto, there was no market for steel-lined jars of the character described and claimed in plaintiffs' patent.

4. All the statements contained in defendants' affidavit filed August 21, 1888, as a supplement to their account.

5. That fully twenty-five per cent of the jars made and sold by defendants, were returned on account of breakage and new jars furnished in lieu thereof.

6. In connection with the foregoing offers, the defendants

produce exhibits X, Y and Z, the former, X, illustrating the kind of jars described and claimed in plaintiffs' patent; the dark wood in each exhibit representing steel, and the other parts representing iron. Y illustrates a steel quarter jar and Z, an all-steel jar.

7. The defendants offer to prove that some of the jars named in the account stated (and what ones) although made and sold and charged in the books, were broken and returned and by the terms of the contract, not to be paid for.

The plaintiffs having objected to these offers, the master, under the conclusions of his former report, made the following ruling thereon:

The defendants' offers of evidence are overruled; the first,[6] second,[7] fourth, fifth[8] and seventh as incompetent, and the third and sixth as immaterial and irrelevant.

On February 4, 1889, the master made his final report, finding: That the license contract between the plaintiffs and defendants continued in force from its date until June 16, 1885, the date of the expiration of the patent; that all of the jars and jar fillings reported by the defendants as made and sold by them from December 25, 1878, to June 16, 1885, were made and sold in violation of their covenants and agreements contained in said license, and that the sum of ten dollars upon each and every jar or jar filling so made and sold, became due, owing and payable from the defendants to the plaintiffs, on the fifth day of each month succeeding the month in which they were manufactured and sold, as provided in said license; that the plaintiffs are entitled to recover from the defendants in this proceeding the said sum of ten dollars royalty for each and every jar or jar filling so made and sold by them as aforesaid, with interest thereon from the fifth day of each month next succeeding the month of manufacture and sale, at which time it was provided in said license the defendants were to render their account and pay the said royalty of ten dollars, by reason of the violation and breach by said defendants of the covenants and agreements in said license on their part to be kept and performed; and that said defendants are indebted to and owe the plaintiffs for said royalty on 724 sets of drilling jars or jar fillings made and sold by them from December 25, 1878, to

June 16, 1885, with interest as aforesaid, computed to the fifth day of January, 1889, the date of this report.

He thereupon stated an account against the defendants, the earliest item of which was for the month of August, 1879; charged the defendants with royalties amounting to $7,240, and interest thereon amounting to $2,389.15, aggregating $9,629.15; and recommended a decree that they pay the said sum to the plaintiffs, with costs.

Exceptions on the part of the defendants to his final report, having been overruled by the master, and renewed before the court, after argument they were dismissed, and thereupon the court, filing no opinion, entered a final decree in the form recommended by the master.[11] The defendants then took this appeal, specifying that the court erred:

1, 2. In overruling defendants' exceptions to the master's findings.[1][2]

4. In the interlocutory decree directing an account.[4]

6–8. In dismissing the exceptions to the master's rulings on defendants' offers.[6 to 8]

11. In entering the final decree recommended by the master.[11]

*Mr. D. F. Patterson* (with him *Mr. John M. Thompson* and *Mr. Wm. Thompson*), for the appellants:

1. The marginal writing on the printed form of license is entitled to special consideration: Grandin v. Insurance Co., 107 Pa. 26. Its manifest purpose was to enable the licensees to cancel the contract without shutting up shop and regardless of the licensor's consent; otherwise it meant nothing, or at least added nothing to the contract. Sterrett, who wrote it, alone testifies that anything was omitted from the writing, and this is denied by the answer, and by the testimony of Ireland, McCaughtry and Artman. That Ireland and McCaughtry were properly excluded by the master is not clear, as Mitchell was a party to the contract only by virtue of his acquiescence in, and ratification of the act of his agent Sterrett, in which he had no personal part, and about which he could not testify, if alive, because he knew nothing personally: Pattison v. Armstrong, 74 Pa. 476. Artman's testimony is not fairly treated by the master; it is more than mere negative testimony.

2. But even without the testimony of these witnesses on behalf of the defendants, the master had no warrant to find as true this allegation of omission, first made after the lapse of ten years, solely upon the testimony of Sterrett, who is admittedly interested, is in no sense corroborated by circumstances equal to another witness, and against whom all the attending circumstances are arrayed : Juniata etc. Ass'n v. Hetzel, 103 Pa. 507 ; Murray v. Railroad Co., 103 Pa. 37 ; Phillips v. Meily, 106 Pa. 536 ; Sylvius v. Kosek, 117 Pa. 67 ; Thomas v. Loose, 114 Pa. 35. Moreover, even if the evidence were of such a character as to prove conclusively that the alleged stipulation was agreed to and omitted by mistake, the circumstances are such as to prevent the plaintiffs from setting up the omission.

3. For, when the licensors ratified the act of their agent, by accepting and acting under the contract as made by him, they had no notice, so far as appears, of any omission, and accepted it just as it was written. Manifestly the plaintiffs had no such notice prior to filing their bill. We submit that the writing is the only contract on which the minds of the parties met, that the plaintiffs are bound thereby, and that the defendants had the right to cancel on the conditions therein specified. With regard to the sufficiency of their notice of cancellation this court is not bound by the master's finding, since it is simply his conclusion drawn from an undisputed writing : Phillips's App., 68 Pa. 130 ; Moyer's App., 77 Pa. 482 ; Hindman's App., 85 Pa. 466. The intention to cancel could not have been more clearly expressed than it was by the defendant's letter of December 19, 1878. By not charging the defendants with any dues prior to August, 1879, the master practically finds that all prior dues were paid by the check of February 8, 1879. The defendants therefore complied with the conditions required to make the cancellation effective.

4. The interlocutory decree was not in accordance with the established rule, and resulted in great injustice. Upon the first reference to the master, the existence of a liability to account should be determined, but not the extent of the liability : Hedge's App., 63 Pa. 273. The testimony offered at the second hearing was manifestly no part of our case at the first hearing. But the court's decree, upon the master's first report, was practically final. It required that the defendants'

account, at the rate of ten dollars each, for all jars made, regardless of whether they were covered by the patent or were merchantable, and to pay the costs, leaving nothing open for the accounting but the simple question of the number of jars made and the amount of interest to be computed. The master was thus compelled to reject our testimony respecting the kind of jars made. The plaintiffs' claim, if they had any, for the manufacture of other than the patented jars, would not be for ten dollars each, as liquidated damages, nor a proper subject for accounting in equity.

*Mr. Charles McCandless* and *Mr. Joshua Douglass*, for the appellees :

1. The amendment to the memorandum on the margin of the license was clearly proved by the testimony of the scrivener who wrote the memorandum, and in such a case as this the testimony of a single witness is sufficient : Real Estate etc. Co.'s App., 125 Pa. 549. His testimony was given without objection; and, even if he were incompetent, because of the death of D. H. Mitchell, it is now too late to raise the objection : Ackerman's App., 106 Pa. 1. But as the Gibbs & Sterrett Manufacturing Company was a corporation in the hands of a receiver, the witness was not a party in such sense that an objection would have excluded him : Fell v. McHenry, 42 Pa. 41.

2. Artman's testimony was not contradictory of that given by Sterrett; and Ireland and McCaughtry were clearly incompetent, and were properly excluded on our objection, upon the ground of interest : Karns v. Tanner, 66 Pa. 297 ; Hanna v. Wray, 77 Pa. 27 ; Gardner v. McLallen, 79 Pa. 398 ; Standbridge v. Catanach, 83 Pa. 368 ; Arthurs v. King, 84 Pa. 526 ; Foster v. Collner, 107 Pa. 305 ; Adams v. Edwards, 115 Pa. 211. The testimony of Sterrett is corroborated by the terms of the alleged notice of cancellation, and by the fact that the defendants, by paying on February 8, 1879, for jars sold after the notice, without saying anything about cancellation, recognized the obligations of their agreement and their liability thereunder.

3. The findings of fact by a master, sanctioned by the court below, will not be set aside except for plain error : Kisor's App.,

62 Pa. 428 ; Sproull's App., 71 Pa. 137 ; Burton's App., 93 Pa. 214 ; Crowell v. James, 2 W. N. 176. Moreover, conceding defendants a right to rescind, they must, before doing so, comply fully with the requirements of the contract up to that time. They did not. They did not then render a statement of jars made, and make payment for them within the time prescribed in the contract. They refused to permit the plaintiff's agent to examine their books. They admit that they violated, all through, their engagement not to make or sell jars not covered by the patent. Therefore, under no reasonable construction were they entitled to cancel.

4. The understanding and agreement of the parties clearly was that the defendants should account and pay for all jars made and sold during the continuance of the contract, at the rate of ten dollars per set, without regard to their construction or the combination of materials employed. The intention of the agreement was to obviate all disputes as to infringement, and all the trouble, difficulty and expense of discriminating between jars made exactly in conformity with the description in the patent and other jars slightly differing therefrom. It is fair to assume that the contract was made in view of the impossibility of verifying reports of the number made in accordance with the patent, especially since, as soon as sold and taken to the oil fields for use, they would practically be beyond the reach of inspection.

OPINION, MR. JUSTICE MITCHELL :

Notwithstanding the report of a master, confirmed by the court below, in appellees' favor, we are of opinion that clear fundamental error, participated in by the master and the court, as well as the counsel, runs through the whole of the appellees' case.

The appellants, in May, 1876, accepted a license from appellees for the manufacture of drilling jars and jar fillings under a certain patent. The agreement was in writing; that is, it was a printed form, filled in as to names, dates, etc., in writing, and with the addition in writing, on the margin, of the following stipulation: "It is agreed by the parties of the first part that the parties of the second part [licensees] can cancel this license by giving thirty days' notice in writing, and paying all

dues." It is undisputed that this clause was written by the agent of the licensors before the execution of the agreement by the licensees, and his authority to make such agreement is not seriously questioned, as, in view of the acceptance of the contract by his principals, and the collection of royalties under it for more than two years and a half, it could not well be.

This portion of the instrument, being a special manuscript addition to a printed form, is presumed to have been separately and particularly considered by the parties, and to express their exact agreement upon the subject. It is therefore entitled to especial weight: Grandin v. Insurance Co., 107 Pa. 36.

Both parties acted under the license agreement until December 19, 1878, when the licensees, under the written clause above quoted, sent a notice to the licensors in the following terms : " We wish to cancel our license concerning the manufacture of drilling jars, bearing date of May 16, 1876, as per contract. You will please return our bond to us, and we will return the license to you by return mail."

This notice is the hinge of the whole case. After having given it, the licensees (appellants) ceased to make jars under the patent, and to furnish accounts or pay royalties, except for those made during the thirty days between the notice and the termination of the license. They continued, however, to make jars of other kinds; and, more than six years later, the complainants filed the present bill for an account and royalty on all the jars made during the interval, whether under their patent or not. The learned master held that this notice " does not declare a rescission or cancellation of the said license by the defendants. It merely expresses a wish to cancel, and a willingness on part of the defendants to return the license to plaintiffs upon receipt of their bond." We are entirely unable to concur in this construction. The learned master has given too much weight to the courtesies of modern business correspondence. " We wish to cancel " imports nothing in the nature of a request for consent, or deference to the views of the other party. It announces, though in civil phrase, the intention of the writer to exercise his right reserved to him, " as per contract," and it does so with a certain appropriateness of language, as, under the agreement, the rescission is not immediate, but is to take effect at the expiration of thirty days. Again,

the, subsequent phrase, "you will please return our bond," is not a request as the master views it. "You will return our bond," would certainly be an order, not a request, and there is no difference between the two, except in politeness of phraseology. It is entirely clear that this letter was an absolute and complete rescission of the agreement.

Why then was it not effective? The master holds that "the duration of the agreement . . . . . was coincident with that of the patent, unless the term thereof was sooner terminated by the mutual act and consent of the plaintiffs and defendants." Such a construction is totally inadmissible. It is repugnant, not only to the clear and express words of the contract, but to its very nature and purpose. It may be doubted if any business man in the state is so ignorant of law as not to know that the parties to a contract may rescind it at any time by mutual act and consent, and if there be such a man, he is hardly the one whom a corporation dealing in patent licenses would intrust with a lot of blank contracts, to go around the country and bring in unwilling manufacturers, in the way that the evidence discloses in this case. One of the clauses in the agreement is that in case of licensees' default, in making the statements and payments provided for, the license should "be forfeited at the option of the parties of the first part." Did the experienced agent who wrote the special agreement think that that forfeiture also was to be by mutual act and consent? This whole theory of the necessity of mutual consent to the exercise of a privilege plainly reserved to one party, is too much at variance with the very object and inducements of the privilege, to be worthy of serious consideration.

Complainants, probably feeling the untenability of their case upon any of the grounds so far discussed, amended their bill, and set up that the written clause as to rescission was incomplete, and the words, "and stop making the jars thereafter," were accidentally and inadvertently omitted at the end. "Stop making the jars." What jars? Plainly the patent jars covered by the license. Had the respondents gone on making such jars after the rescission, such a provision would have given complainants a liquidated measure of damages for such infringement of their patent rights. But as respondents admittedly ceased making such jars, and the complainants' claim is based

entirely on the making of other jars, of what possible use can the amendment be in the present suit? This point seems so perfectly obvious that I have been led to examine the original amendment, as sworn to and filed, to see if there was any misprint in the paper-books. But there is not. The record shows the amendment as above quoted.

This really makes further discussion superfluous. But as the master and counsel have treated the amendment as if it were "stop making jars" generally, it may be worth while to add a few words on the evidence to justify such an alteration of the contract. That it was a material alteration is beyond question. If the master and the court below were right, it was material enough to support a decree for nearly $10,000 against the appellants. Being a material alteration of a written contract, how does it stand in respect to evidence? It is denied in the sworn answer, and therefore must be established by the clear testimony of two witnesses or strong corroborating circumstances. It has neither. It comes into this suit more than a year after the bill was filed, and more than ten years after the alleged mistake was made. It comes in on the unsupported testimony of one interested witness, whose evidence is so lacking in precision of language that, while he four or five times rehearses the story in relation to the licensees' question as to their possible desire "to quit business," or "quit manufacturing jars," he nowhere uses the words "stop making," in which he finally incorporated the amendment, to say nothing of his introduction therein of the word "the," which absolutely nullified any possible benefit to be derived from it. This is verbal criticism to be sure, but it shows the indistinctness of the witness's memory, and the entire absence of any form of words agreed on by the parties as parts of the contract. In regard to corroborating circumstances, the case is equally lame. No possible inducement for such an agreement on the part of the licensees has been shown. They were making other jars before the license, and of course could make them again after its expiration or rescission. What were they to gain by such a stipulation? And the evidence is undisputed that the written clause was added at their instance. I have not referred to the contradiction by Artman, or to the competency of the licensees themselves by reason of the death of one of the licensors. It

is unnecessary. The whole story is so inherently improbable that, if it were before a jury on the same evidence, it would require a well-seasoned and rather hardy advocate to ask twelve men to believe it. Before a chancellor, it has not a foot to stand on.

Lastly ; it is said that the respondents could not effectively rescind, because they failed to keep the condition that they should keep and exhibit their books, etc., and pay all dues. We do not find any evidence of such breach. It is admitted that they paid the royalty on all the patent jars they made, and the only refusal to exhibit their books that we find in the evidence is when complainants' agent, Sterrett, was at Petrolia, a month or so after the notice of rescission ; and, as his request to inspect the books was accompanied by the unwarranted demand that they should also " quit making jars," the respondents were fully justified in refusing it.

As there was a clear rescission of the agreement, no account was due by appellants at all. But it may be well to say that, even if the complainants had been entitled to an account on their own view of the case, there was no evidence on which this decree could stand. The agreement provided that during its continuance the licensees would not make any other kind of jars, but the royalty on the patented jars was not stipulated damages for the breach of that covenant, and there is no evidence at all in the case that it was a proper measure of such damages.

The decree is reversed, and the bill dismissed, with costs.